———— FILED _____ ENTERED
———— LOGGED _____ RECEIVED

JUL 3 0 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## **EXHIBIT A**

### **REDACTED AFFIDAVIT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCH OF** | ) | |
| **CERTAIN SPECIFIED PREMISES** | ) | Misc. Nos._____ |
| | ) | |
| | ) | **UNDER SEAL** |

**19 - 2 3 3 3  ADC** ~~thru~~ **19 - 2 3 4 3  ADC**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

M@B

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................1

II.    PURPOSE OF AFFIDAVIT .............................................................5

III.    BACKGROUND .............................................................................8

IV.    THE LIBERTY AND GARRISON ENTERPRISE ........................10

V.    THE INVESTIGATION ................................................................13

VI.    THE TARGET LOCATIONS .......................................................21

        A) 3106 Oakford Avenue, Baltimore, Maryland..........................21

        B) 3907 Bonner Road, Baltimore, Maryland................................28

        C) 4048 Hilton Road, Second Floor Apartment, Baltimore, Maryland........30

        D) 3316 Arydale Avenue, Baltimore, Maryland............................32

        E) 8624 Glen Hannah Court, Windsor Mill, Maryland .................37

        F) 3922 Fairview Avenue, Baltimore, Maryland ..........................40

        G) 4002 Fairfax Road, Baltimore, Maryland................................46

        H) 10005 Mill Centre Drive, Apartment 487, Owings Mills, Maryland ........50

        I) 3955 Bonner Road, Baltimore, Maryland................................52

        J) 10090 Mill Run Circle, Apartment 340, Owings Mills, Maryland ...........55

        K) 2100 Clifton Avenue, Baltimore, Maryland ...........................61

VII.    REQUEST FOR EARLY ENTRY AND "NO KNOCK" WARRANTS...................62

VIII.    CONCLUSION ............................................................................63

IX.    ATTACHMENTS ........................................................................

i



## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Brian T. Shutt, a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

## I. INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      I have been a sworn police officer with the Baltimore Police Department ("BPD") since June 20, 2002 and currently assigned to Drug Enforcement Agency ("DEA") Group 52 (Heroin Task Force) of the High Intensity Drug Trafficking Area ("HIDTA"). Prior to my employment with the BPD, I was a sworn Deputy Sheriff with the Cecil County Sheriff's Office from June 1999 through June 2002. I have held positions within the Patrol Division, and the Criminal Investigative Division's Narcotics Investigations. I have completed two separate six-month basic Police Academies that included classes pertaining to controlled dangerous substances ("CDS"). I also attended more than ten advanced investigative courses, to include a five day HIDTA Title III Training Course. Prior assignments with the BPD include Uniform Patrol Division in the Eastern District, the Eastern District Drug Unit, and the Organized Crime Division. I have personally conducted and participated in numerous investigations involving criminal activity, including but not limited to, CDS offenses, violent crime, and firearms violations. I have participated in the arrest of over 800 persons for CDS offenses, violent crime, or firearms violations and has authored or executed more than 300 search and seizure warrants relating to CDS offenses, violent crime, or firearms violations. I have been recognized as an expert witness in the

1

United States District Court for the District of Maryland, the Circuit Court for Baltimore City, the Maryland District Court for Cecil County, and the Circuit Court for Cecil County.

3.      Through training and interviews of hundreds of persons arrested for CDS offenses, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I have also participated in hundreds of hours of surveillance of suspected drug traffickers.

4.      Based upon my training and experience, I am aware that persons involved in the drug trafficking generally keep and maintain records of their various activities. Experience in similar cases has established that such records are regularly concealed in a suspect's automobile, residence, office, storage units, or on their person, and that they take various forms. Documents commonly concealed by drug traffickers include, but are not limited to, notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. The aforementioned items are kept in locations that are considered safe by drug traffickers, such as safety deposit boxes, storage units, residences, vehicles and on their person, where they have ready access to them. I know that drug traffickers will often have several residences or locations where they store the above items, thus decreasing the likelihood of detection by law enforcement.

5.      Based on my training, knowledge, and experience, I also know that drug traffickers commonly utilize vehicles to pick up and deliver drugs; to meet with drug customers, sources, and co-conspirators; and to transport drugs and drug proceeds to stash locations. Furthermore, drug

traffickers will commonly place vehicles (assets) in the name of a third party individual in order to avoid detection by law enforcement and subsequent seizure even though they retain complete control of that asset.

6.      Because I submit this affidavit for the limited purpose of establishing probable cause for the issuance of search warrants, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts believed to be necessary to establish probable cause. I have not, however, excluded any known information that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, review of documents and other evidence, and conversations with other law enforcement officers and other individuals. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on a review of audio recordings and draft transcripts thereof. In some instances, as indicated below, specific quotations are based on information obtained from confidential sources who participated in the conversations.

7.      I have become familiar with method of operation, in which Drug Trafficking Organizations ("DTOs") and criminal enterprises, such as the enterprise under investigation here, operate in order to thwart law enforcement efforts. Based on this familiarization, I have learned from my training and experience in drug enforcement the following:

a. Drug trafficking and gang activity is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

b. Drug traffickers and gang members commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell. In that regard, I know that members of one cell commonly are provided with information only about their specific cell's

3

criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization.

c.  Drug traffickers and gang members commonly possess – that is on their person, in their vehicles, at their residence, and/or inside their "stash locations," firearms, including, without limitation, handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Drug trafficking is a highly lucrative business and such weapons are used to protect and secure the traffickers' property (for example, drugs, jewelry, drug paraphernalia, records, currency, etc.)

d.  Cellular telephones are an indispensable tool of the drug trafficking trade and gang activity. Drug traffickers and gang members use cellular telephones, Short Message Service ("SMS"), Multimedia Messaging Service ("MMS"), electronic-mail ("e-mail"), cellular applications and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and drug traffickers. In addition, drug traffickers will often change their cellphones following the arrest of a member of their Drug Trafficking Organization or at random in order to frustrate law enforcement efforts.

e.  Drug traffickers often swap vehicles with other conspirators, use rental vehicles, use multiple vehicles, and use vehicles registered in names other than their own in order to frustrate law enforcement efforts.

f.  Drug traffickers use uninhabitable locations (for example, vacant dwellings, storage locations, etc.), as well as populated locations (for example, businesses, apartments, etc.) often under another person's name, as "stash locations" for the storage of drugs and/or currency, as well as to process and package drugs for distribution.

g.  Drug traffickers often place control and ownership of assets (including real property) in names other than their own to avoid detection of those assets and locations by government agencies. Even though assets are in the names of other people, drug traffickers retain ownership, control, and use of the assets, exercising dominion and control over them.

h.  Drug traffickers must maintain on-hand large amounts of currency to finance their on-going drug business.

i.  Drug traffickers often have unexplained wealth, assets, and a high standard of living with no reported income which is probative evidence of crimes involving drug trafficking.

j.  Members of gangs and other criminal enterprises often keep and maintain in their houses evidence of gang membership, including, but not limited to gang rules, membership lists, photos of gang members, and letters from gang members.

4

## II. <u>PURPOSE OF AFFIDAVIT</u>

8.      I submit this affidavit in support of search warrants for the following locations,

collectively referred herein as the "**TARGET LOCATIONS:**"

a.  **3106 Oakford Avenue, Baltimore, Maryland 21215 (TARGET LOCATION 1)**, more fully described in Attachment A-1, is a brick row home. The residence has a covered front porch area and a grey colored front door with glass inserts near the top of the door. The residence has a black colored mailbox to the left of the front door. The residence has three windows facing the front on the second floor and two windows facing the front on the ground level.

b.  **3907 Bonner Road, Baltimore, Maryland 21216 (TARGET LOCATION 2)**, more fully described in Attachment A-2, is a brick row home. The residence has a covered front porch with a dark colored front door. The numbers "3907" are attached to the left side of the front door. The residence has five windows on the front side. The front of the residence has a metal fence.

c.  **4048 Hilton Road, Second Floor Apartment, Baltimore, Maryland 21215 (TARGET LOCATION 3)**, more fully described in Attachment A-3, is the second floor apartment located inside of a brick row home. The residence has a black metal gate screen door, along with a dark colored front door. There are two black mailboxes to the left of the front door. The number "0" and an upside down "4" are attached to the right side of the door. The second floor of the building has three windows that face the front.

d.  **3316 Arydale Avenue, Baltimore, Maryland 21216 (TARGET LOCATION 4)**, more fully described in Attachment A-4, is a business located on the 3300 block of Arydale Avenue. The target location is a light colored brick building. The business has a glass front door with the name "Opaque" and the numbers "3316" attached to the front. The front of the business has a large window, and inside the window is a neon "open" sign.

e.  **8624 Glen Hannah Court, Windsor Mill, Maryland 21224 (TARGET LOCATION 5)**, more fully described in Attachment A-5, is a brick, two story single family residence. The residence has black colored grated steel front doors. There are two lion statues, one on each side at the front of the residence. The residence has a driveway that leads to the side of the residence which has two garage doors (one garage door is a two car garage door, and the second is a single car garage door). The residence has a green colored mailbox located where the driveway of the residence meets the street. The mailbox has the number "8624" attached.

f. **3922 Fairview Avenue, Baltimore, Maryland 21216 (TARGET LOCATION 6)**, more fully described in Attachment A-6, is a single family residence. The residence has white colored siding, and appears to be three stories. The front door to the residence is white with an oval glass center. There are concrete steps leading to the front door of the residence, with wooden rails. There is a black mailbox to the right of the front door. The residence has a black metal fence around the property.

g. **4002 Fairfax Road, Baltimore, Maryland 21216 (TARGET LOCATION 7)**, more fully described in Attachment A-7, is a brick row home. The residence has a covered front porch. The entrance to the residence has a metal storm door and white colored front door with glass inserts. The numbers "4002" are attached to the front of the covered porch. The residence as two sets of concrete steps leading to the front porch.

h. **10005 Mill Centre Drive, Apartment 487, Owings Mills, Maryland 21117 (TARGET LOCATION 8)**, further described in Attachment A-8, is an apartment located in an apartment complex located at 10005 Mill Centre Drive. The rear entrance to the building has a white colored door with the numbers "10005" attached. The front door to the residence is green colored with the numbers "487" attached to the left of the front door.

i. **3955 Bonner Road, Baltimore, Maryland 21216 (TARGET LOCATION 9)**, more fully described in Attachment A-9, is a single family residence. The residence has light colored siding and a covered front porch. The residence has a white colored front storm door and a light colored front door. The numbers "3955" are attached to the right of the front door. The residence has a metal fence around the property.

j. **10090 Mill Run Circle, Apartment 340, Owings Mills, Maryland 21117 (TARGET LOCATION 10)**, more fully described in Attachment A-10, is an apartment located in the Greenwich Place apartment complex. Apartment 340 is located on the east side of the complex. The front door to the apartment is red colored and has the numbers "340" attached. The front door also has a silver colored metal knocker attached to the front door.

k. **2100 Clifton Avenue, Baltimore, Maryland 21217 TARGET LOCATION 11)**, more fully described in Attachment A-11, is a row home. The first story is brick and the second story (front) has light colored siding. The residence has a covered front porch. The front door to the residence has a metal storm door, and a light colored front door. The numbers "2100" appear to the right of the front door, along with a black in color metal mailbox.

6

9.      Based on the information set forth in this affidavit, I submit that there is probable cause to believe that the execution of search warrants at the **TARGET LOCATIONS** will yield evidence, fruits, and instrumentalities concerning the following offenses (collectively, the "**Target Offenses**"): Racketeering Conspiracy (Racketeer Influenced and Corrupt Organizations "RICO"), in violation of 18 U.S.C. § 1962(d); Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances, in violation of 21 U.S.C. § 846; Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1); and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c).

10.     I submit this affidavit based upon personal knowledge derived from my participation in this investigation, including, but not limited to the following: (a) information from other law enforcement personnel; (b) from other witnesses; (c) physical and electronic surveillance; (d) written reports of investigations and other law enforcement reports; (e) arrests, seizures of evidence, and search warrants; (f) review of social media; (g) information obtained from subpoenas and court orders; and (h) review of intercepted wire and electronic communications obtained pursuant to federal wiretap orders.

11.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have reviewed. Such statements are stated in substance, unless otherwise indicated. Wherever in this affidavit I state a belief, such belief is based upon my training and experience, and the information obtained through this investigation.

7

intercept communications of CRAWFORD. Ultimately, WILSON and other members of the DTO were indicted by a federal grand jury for drug trafficking offenses. *See United States v. Sean Wilson, et al.*, CCB-14-334. CRAWFORD was not, however, charged in the case.

15.     On April 29, 2015, HUNT contacted a DEA Task Force Officer to report his concerns that had been approached by CRAWFORD. HUNT reported that while he was working at the "Cut Masters" barbershop in Baltimore that approached him. CRAWFORD wanted to talk to HUNT about the ongoing federal case involving the WILSON DTO. CRAWFORD asked HUNT, "What's going on with your case?" HUNT told CRAWFORD that he was scheduled to surrender for sentencing but did not discuss his case further.

16.     Later that day, HUNT was murdered while he stood outside the same barbershop. HUNT was shot in the head by a gunman who posed as a customer of the barbershop. BPD investigators obtained video surveillance from the area. From the surveillance and the overall investigation, BPD investigators identified a vehicle believed to be used to transport the gunman away from the murder scene.

17.     During the investigation of HUNT's murder, a proven, reliable confidential source ("CS 1") spoke to investigators about the murder.[1] CS 1 has identified a photograph of Brandon CRAWFORD as "Goat" and knows that CRAWFORD is a bulk distributor (i.e. kilogram quantities) of heroin and cocaine in the Baltimore metropolitan area. CS 1 viewed a surveillance photo from a nearby deli that appeared to depict the getaway driver in the HUNT murder. CS 1 stated that CS 1 believed that the person depicted in the photo was CRAWFORD based on the fact

---

[1] CS 1 is not presently facing criminal charges, however, CS 1 has a federal drug trafficking and conviction. CS 1 has cooperated with the DEA since approximately 2009 and receives financial compensation for CS 1's actions CS 1's information and actions have led to the seizure of over fifty kilograms of cocaine, over twenty kilograms of heroin, and over one million dollars in drug proceeds.

that the person in the photo was wearing the same type of ring that CRAWFORD normally wears and was wearing it on the same hand and finger where CRAWFORD normally wears the ring. A BPD detective also showed a portion of the surveillance video that showed the suspected getaway driver walking. While the person's face was not clearly visible, CS 1 stated that the person depicted in the video physically resembled CRAWFORD and CS 1 believed that this person was CRAWFORD. To date, no arrests have been made relating to HUNT's murder.

## IV. THE LIBERTY AND GARRISON ENTERPRISE

18.     From the continued investigation of CRAWFORD, DEA investigators identified an organization identifying itself as "LNG." LNG stands for Liberty and Garrison, and refers to an intersection in Northwest Baltimore. While some people who live in this neighbored may refer to the physical area as "LNG," investigators have identified that members of the LNG criminal enterprise consists of a distinct group of individuals who share social and/or familial ties with the area, and who engage in drug trafficking together, among other criminal activity. The investigation has further identified that LNG is comprised of two allied groups who work together: the Yellow Bus Gang ("YBG") Crips and the Black Guerilla Family ("BGF").

19.     The Crips, also known as the "Original Crip Homies," is a nationwide gang operating in numerous prisons and cities across the country. The Crips was founded in Los Angeles, California in or around the 1960s. In the 1990s, the Crips began appearing in Maryland and the Baltimore area. The Crips are involved in criminal activity, including murder, robbery, extortion, narcotics trafficking, obstruction of justice, and witness intimidation throughout communities in Baltimore City, the State of Maryland, and elsewhere. Though the gang started as a single structured organization, the gang is now a loosely connected network of individual "sets," which most times act autonomously from each other. These sets often identify with particular

10

geographic areas. The Yellow Bus Gang is a Crips set that is largely based in Northwest Baltimore. YBG brands itself as both a rap group and as set of the Crips. Members of the gang openly rap about their status in the Crips, and the subjects of their songs often relate to their gang status, drug dealing, and other criminal activity. YBG members appears to follow the same rules and traditions followed by many Crips sets, including, but not limited to the following:

   a. Visible demonstrations of gang affiliation, such as identification with the color blue and use of gang logos, which appear in clothing, hats, and bandanas worn by YBG members.

   b. Use of hand signs identifying membership, such as by forming the letter "C" with one's hand.

   c. Maintaining a violent rivalry with the Bloods street gang, a historic rival of the Crips.

   d. Use of specific phrases or spelling conventions. For example, replacing "ck" with "cc" because "ck" is considered a sign of disrespect ("CK" stands for Crip Killer in the Bloods community).

   e. Rules governing admission into the gang, as well as a hierarchical power structure. Similarly, a system of rules and punishment for violating gang rules is also followed.

   20.   LNG is also comprised of BGF members who participate in drug trafficking and the illegal possession of firearms, often in coordination with YBG members. The Black Guerilla Family, or BGF, was originally formed as a prison gang founded in 1966 by George Jackson, George Lewis, and W.L. Nolen while they were incarcerated in a state prison in California. This gang has spread across the United States and operates in Maryland both as a prison gang and a

street gang. Like the Crips, BGF is government by its own internal by-laws and employs its own hierarchical power structure.

21.     The investigation has revealed that members of LNG often simultaneously affiliate as both "LNG" and YBG or BGF. From wiretap interceptions and surveillance, investigators determined that members of the YBG and BGF worked together to operate a drug trafficking organization. Along with intercepted communications, members of both the YBG and BGF have pictures and videos on social media platforms that confirm their alliance. One example of this alliance was posted on November 6, 2018 by Ivan POTTS, a/k/a "Spottie," on his Instagram account:



147 likes

og_spottie Liberty ¹⁄₂ N Garrison blvd is our foundation...we grew together,I left for awhile and you kept growing ⚡...I'm proud of you lil bro @ybg_sosa ,you're a leader and a Great artist and I salute young N.I.G.G.A.....#certifiedsociety #respectdabus #ybg #iou #freedaroni

22.     This picture depicts Antonio JOHNSON a/k/a/ "Sosa," a leader within the YBG Crips, along with POTTS, a leader within BGF. POTTS maintains an active and public Instagram account where POTTS promotes his music and holds himself out as a community leader/advocate.

12

At the same time, however, POTTS simultaneously engages in criminal activity, such as drug distribution and the illegal possession of firearms, and maintains a leadership role in BGF.

23.    Similarly, in February 2019, Linwood DAVIS, a member of LNG and BGF posted the following photo from his Instagram account:



24.    In this post, DAVIS poses with other LNG members, including POTTS, JOHNSON, and Jermaine PORTER. In the post, DAVIS uses the hashtag #locsandguerrillas. From training and experience, I believe "locs," is a reference to the Crips street gang and "guerillas" is a reference to the Black Guerrilla Family. Based on the context of the photo and the comments, I believe DAVIS was identifying that LNG is comprised of both YBG Crips and BGF members.

## V. THE INVESTIGATION

25.    Beginning in December 2018 and continuing through June 2019, the Honorable Catherine C. Blake, United States District Judge for the District of Maryland, authorized the

13

interception of wire and/or electronic communications occurring over phones used by members and associates of LNG. Judge Blake authorized the interception of fourteen phones, including phones used by Antonio JOHNSON (TARGET TELEPHONE 1), Ronald MCCORMICK (TARGET TELEPHONE 3 and 8), Marcus HALL (TARGET TELEPHONE 5), Brandon CRAWFORD (TARGET TELEPHONE 7), Michael WILLIAMS (TARGET TELEPHONE 11), and James MURRAY (TARGET TELEPHONE 14).

26.    Interceptions of these telephones revealed evidence of drug trafficking, the illegal possession of firearms, and suspected gang activity. For example, on December 16, 2018, at approximately 8:13 p.m., TARGET TELEPHONE 1, a phone used by Antonio JOHNSON, received a call from 443-922-6974, a phone utilized by Marcus HALL, a/k/a "Lor Pill." During the call, HALL asked JOHNSON, "Where you at bro?" JOHNSON replied, "Out in the County." HALL asked, "You out in the County? What the fuck you ready to do?" JOHNSON replied, "Um shit for real. I'm trying to see him. But I'm really trying to fuck with the studio." HALL replied "Alright." JOHNSON stated, "I just hit the nigga. I'm about to finish this (inaudible) in a couple hours." HALL stated, "Yeah. See I'm out. I ran out of the grays. I'm trying to cop." JOHNSON asked, "Need me?" HALL replied, "Yeah." JOHNSON, stated "Alright. Say less, I'll be around."

27.    I believe that during the call that HALL tried to find out JOHNSON's location. Further into the call, JOHNSON said that he had resupplied an unidentified person with drugs ("I just hit the nigga. I'm about to finish this (inaudible) in a couple hours." HALL said that he had finished selling heroin and needed to be resupplied ("See I'm I ran out of the grays. I'm trying to cop.") Based on training and experience, I believe the term "gray" is often used to describe heroin. JOHNSON then asked if HALL needed him, which I believe meant that JOHNSON wanted to

14

know if HALL needed drugs from him. HALL confirmed and JOHNSON said he would meet with HALL later, presumably to resupply HALL with drugs.

28. From the interception of telephones, investigators also identified that LNG members were utilizing Hayward LEWIS and Robert ANDERSON, a/k/a "Rock," to distribute their drugs. Interceptions revealed that CRAWFORD supplied drugs to JOHNSON and MCCORMICK, who in turn, supplied LEWIS and ANDERSON with the drugs for street level distribution. Investigators identified a drug "shop" where LEWIS and ANDERSON were selling drugs, commonly referred to by LNG members as "the wall." This location is in the area of Arydale Avenue and W. Forrest Park Avenue in Baltimore. Investigators were able to place a camera in the area for a short period of time to monitor the drug distribution by the members of the gang. Camera surveillance captured street-level drug sales taking place at the drug shop.

29. For example, on January 17, 2019, at approximately 9:27 a.m., investigators observed ANDERSON exit an Acura sedan in the 3300 block of Arydale Avenue. ANDERSON walked to the front steps area of 3714 W. Forest Park Avenue ("the wall") and reached behind the steps to remove items. ANDERSON appeared to hand these items to an unidentified woman. Investigators believed that ANDERSON was utilizing a "ground stash" to store the supply of drugs provided to him by members of the LNG. At this time, investigators utilized uniformed officers of the Baltimore Police Department to park in the area, which caused members of the DTO to leave. At this time, TFO Keith Sokolowski traveled to behind the stairwell and located the "ground stash" that ANDERSON was utilizing. TFO Sokolowski recovered multiple glass vials containing suspected cocaine and heroin packaged for street-level sale.

30. After about six days of monitoring this area, however, investigators removed the camera due to the non-fatal shooting of LNG member Donald JACKSON, a/k/a "DJ," that

occurred on January 18, 2019, at approximately 10:59 a.m. During this shooting JACKSON used a vehicle for cover, which sustained gunfire during the shooting. This vehicle turned out to be the DEA's surveillance vehicle. JACKSON was captured on camera holding a suspected firearm, which investigators believe was an attempt by JACKSON to return fire during the shooting. JACKSON was injured during the shooting and later transported to a hospital. The following is a still photo from the shooting of JACKSON:



*JACKSON holding what appears to be a silver semiautomatic handgun in his right hand*

31.     Interceptions revealed that members of LNG subsequently discussed the shooting of JACKSON and how it affected the organization. On January 22, 2019, at approximately 2:29 p.m., Ronald MCCORMICK, a leader in the YBG Crips, utilizing TARGET TELEPHONE 3, received a call from 410-814-9577, a telephone utilized by ANDERSON. During this call ANDERSON stated, "You already know what happened?" MCCORMICK replied, "Yeah I seen'em, I seen'em." ANDERSON stated, "You see them bitches yo? Talking about um, you got um, we got um call. You didn't get no call yo. You got a call you know what I mean? I think

they grabbed um, um, somebody looking suspicious over here. Cause I found one of them shells inside the truck." MCCORMICK stated, "Right." ANDERSON stated, "So I was like, I said saw the bullet holes, and in the dentist office and shit. And just looking. Come on yo, that shit never happened, ain't nobody got no calls yo. Dig what I'm saying? That truck ain't right yo. We got to get that shit away from here yo. Yo I had just put Tony's shit. I just got all that shit from T.I. yo. Yo I'm surprised yo, my leg was just shaking. But he couldn't see cause I got all this shit on. I said man these bitches search me I'm gone. I'm gone, if they search me I'm gone yo. He just kept looking at me. So I was like look, take a look at the truck. You know what I mean? Trying to throw them off. I jumped on the bus yo, come down here to the um, I got, got your shit straight. I ducked on the bus came down here to Hilton and the Resevior yo." Both MCCOMRICK and ANDERSON started laughing. ANDERSON stated, "I'm gonna walk back up in a few minutes yo. Yo my leg wouldn't stop shaking yo. Swear to god yo. Alright yo." MCCORMICK replied, "Alright."

32.     Based on my training and experience, I believe that ANDERSON told MCCORMICK that he was suspicious of law enforcement's recent activity in the area. ANDERSON said he thought the police were conducting some type of investigation. ANDERSON discussed how he and LEWIS had been stopped by the police and the police gave an unavailing explanation for the reason of the stop. ANDERSON also told MCCORMICK that he had found a bullet ("one of them shells") in the surveillance truck. ANDERSON said that they should remove the truck because of this. I believe ANDERSON was inferring that the DEA vehicle was suspicious because the police had not towed the vehicle despite it having been struck by gunfire.

33.     On January 22, 2019, at approximately 4:51 p.m. CRAWFORD, utilizing TARGET TELEPHONE 7, called 410-814-9577, a telephone utilized by Robert ANDERSON. During this

17

call ANDERSON stated, "Mr. G." CRAWFORD asked, "Where you at? You up the way yo?" ANDERSON replied that he was going to a funeral. CRAWFORD asked, "You ain't up on the wall?" ANDERSON replied, "Huh uh. Nope. I just walked from down there. They just moved that truck. Look, look, look, the knockers jumped out on me and June Bug yo. Jumped out on us yo. Talking about they got a strange call and all this and all that. Now, what-cha-call-it told they just moved that truck, towed that truck. That truck was sitting there for seven days." CRAWFORD asked, "Who moved it?" ANDERSON replie,d "Um, they said the police. (Inaudible) called and said the police moved it. They put it on a flat bed and just moved it." CRAWFORD asked, "The police moved it?" ANDERSON replied, "Yup. They said they put it on the flatbed." CRAWFORD stated, "So that shit might have had a camera on it?" ANDERSON stated, "No, I was looking in that mother fucker. I knew there was camera in the back. You know what I'm saying, on the back the truck, but it probable came like that. Not sure." CRAWFORD stated, "That shit had a camera on it." ANDERSON asked, "You think so? I looked all, I looked all inside it." CRAWFORD stated, "You can't see where the camera at Rock. That shit be little as shit. You can't see the camera." ANDERSON stated, "Oh, I got a shell, cause I said damn, I got a shell from out the back of it today." CRAWFORD stated, "I ain't lying yo. They probably got you all niggas doing all types of shit. You got to be careful with that shit." ANDERSON stated, "Damn yo and I need to see you. I'm gonna call you as soon…" CRAWFORD, stated "Yeah I'm right here on the wall. I had needed you."

34.   I believe that during this call that CRAWFORD called ANDERSON to meet him at the drug shop, likely to conduct a drug transaction or to discuss criminal activity in person. ANDERSON told CRAWFORD that the police had moved the surveillance truck. CRAWFORD and ANDERSON discussed what exactly occurred and how ANDERSON had looked for a camera

18

in the vehicle. CRAWFORD admonished ANDERSON, telling him that the truck had a camera and that it would be small so would not see it if he had looked. CRAWFORD concluded that the camera likely captured ANDERSON and other LNG members engaging in illegal activity ("doing all types of shit").

35.     On February 5, 2019, at approximately 4:19 p.m., CRAWFORD, utilizing TARGET TELEPHONE 7, called TARGET TELEPHONE 8, a telephone utilized by Ronald MCCORMICK. During this conversation CRAWFORD stated, "Hey yo, we need to get together yo. Like um, like some important shit. Whatever you told what a, what a, the little kids. We need to clear that out yo. Because that shit gonna be a problem." MCCORMICK stated, "Hold up, what, say it again dummy?" CRAWFORD stated, "I said we need to get together yo. Where you at yo, you up the street?" MCCORMICK replied, "Yeah I'm up the street. You said as far as the little kids?" CRAWFORD stated, "Kayo." MCCORMICK asked, "Huhm yeah you said the little kids?" CRAWFORD stated, "The little kids yo. Whatever you told them I feel like it got back to the monkeys and I think it's gonna be a problem yo. If we don't figure that shit out now." MCCORMICK stated, "Yeah come holler at me, so I know what you're talking about."

36.     I believe that during this call that CRAWFORD discussed with MCCORMICK that they needed to meet in person because of a problem arising between the YBG Crips and BGF members operating together in the area. CRAWFORD explained that MCCORMICK had something to the YBG Crips subordinate to him ("the little kids") that had gotten back to members of BGF ("the monkeys"), which was creating friction. CRAWFORD also identified this pertained to the shooting of Donald JACKSON because CRAWFORD said the name of a suspect in the shooting ("Kayo"). Prior interceptions of MCCORMICK's phone had revealed that "Kayo" is a member or associate of LNG and appeared to have shot JACKSON during an internal dispute.

19

37.     As the investigation continued, DEA investigators identified other members of the LNG enterprise, including Michael WILLIAMS and Ivan POTTS. Interceptions of these individuals continued to reveal evidence that members of LNG engaged in the illegal possession of firearms, in addition to participating in drug trafficking. For example, on March 22, 2019, at approximately 10:31 p.m., Michael WILLIAMS, utilizing TARGE TELEPHONE 12, called 443-978-2192, a phone used by "UM 2192. During the call, UM 2192 admonished WILLIAMS for losing a gun (referring to as a "joint") and, failing to report the loss of the gun. WILLIAMS explained he had been carrying the gun on him but had to hide it bushes when police were in the area. WILLIAMS said that when returned to retrieve the gun that someone had already taken the gun. UM 2192 responded:

> "Yo, you niggas is playing with me too much, yo. Imma tell you...ya'll doing too much talking, ya'll playing with me too much, man. I ain't 'Goat.' I don't play about my guns and I don't play about none of that. All ya'll can talk all that dumbass shit you want. Cause I'm gonna kill one of these niggas, yo, if you keep playing with me. But, yo, look....I don't know what the fuck ya'll doing, yo, but I don't...look I got one just like you gave me mine, with a beam on it and everything. I got it, right now. So now now what happen...fuck all what happened. Why ain't nobody get shot behind my shit, yo? I was (inaudible) about you. Mega, you will not do the same, yo. That's crazy, yo. Yo, I'm tired of you nigga. I tired of listening to you, nigga! Listen to me! Listen to me, yo. I ain't trying to be the big man. Ya'll niggas. I don't do shit, that is not supposed to be done, yo. You didn't even call me and say I had an accident at the store. And I asked you about it and what did you say to me? What did you say?"

38.     WILLIAMS attempted to explain his actions, but UM 2192 continued to berate WILLIAMS. Ultimately, UM 2192 appeared to terminate the call while WILLIAMS continued to justify why he had not told UM 2192 before about the lost gun. When UM 2192 referenced "Goat," I believe he was referring to CRAWFORD, explaining that unlike CRAWFORD, UM 2192 would not have a problem retaliating with violence for the lost firearm.

it again?" CRAWFORD stated, "The man. The man Shutt." JOHNSON replied, "Yeah." CRAWFORD stated, "Yeah yo, he coming. Shit been weird as shit." JOHNSON's reply was inaudible. CRAWFORD stated, "Shit we be all right though. Just got to keep moving shit yo (inaudible)." JOHNSON replied, "Um hmm. Shit, where you at though? That's what I'm doing now though for real." CRAWFORD stated, "I'm in my shit". CRAWFORD and JOHNSON then continued to discuss meeting.

    42.    Based on the context of the conversation, I believe that CRAWFORD asked JOHNSON why he had not repaid him for drugs, asking if JOHNSON had forgotten to count. JOHNSON explained that he had not finished, which I believe meant that he still had drug product he needed to sell. JOHNSON said he was reviewing "merchandise numbers" in his notebook. I know drug traffickers often use ledgers to track drug sales. CRAWFORD then warned JOHNSON that he believed law enforcement ("the man") may be pursuing them. When JOHNSON asked CRAWFORD to elaborate, CRAWFORD referred to me by my last name. Due to the prior DEA investigation involving HUNT, WILSON, and CRAWFORD, I know that CRAWFORD is familiar with me as a DEA investigator. CRAWFORD then told JOHNSON not to worry and that they should continue selling drugs like normal ("Just got to keep moving shit yo.")

    43.    On January 28, 2019, at approximately 6:08 p.m. Antonio JOHNSON, utilizing TARGET TELEPHONE 1, called 443-683-7308, a telephone utilized by Brandon CRAWFORD a/k/a "Goat". During the call, CRAWFORD asked "Hey yo what's up yo, hey you ain't talked to Rock yo?" JOHNSON replied, "Hell no." CRAWFORD replied, "I talked to him in text yo. He said he in the rehab or some shit." JOHNSON replied in the positive. CRAWFORD stated, "His tough ass scared to come around here." JOHNSON replied, "Yeah, he ran off with them thitty's." CRAWFORD stated, "I'm trying to help him out yo. He won't answer the phone and shit. He

keep on texting me." JOHNSON replied, "Same thing here. (Inaudible) got to work off or something." CRAWFORD stated, "I think dummy had something to do with it too though. Cause he kept fucking up dummy's shit. Why would you keep giving him shit to fuck up. You know he fucked dumb dumb's shit a couple times?" JOHNSON replied, "No I didn't know that." CRAWFORD replied, "Yeah, he had to work it off. That's what I'm saying, so yo probably had something to do with it anyway. Yeah exactly." JOHNSON stated, "Right." CRAWFORD stated, "He made sure he work his shit off guess cause he has tattoos on his face and shit. He, he think dummy do something to him." JOHNSON replied in the positive. CRAWFORD stated "He think that man gonna murder him." JOHNSON stated, "As he fool everybody." CRAWFORD and JOHNSON then agree to meet.

44.    I believe that during the call that CRAWFORD and JOHNSON discussed the whereabouts of Robert ANDERSON ("Rock"), a drug distributor in the organization. CRAWFORD said ANDERSON claimed to be in rehab but CRAWFORD was suspicious of this. JOHNSON said that ANDERSON stole drugs from the group ("Yeah, he ran off with them thitty's."). Both CRAWFORD and JOHNSON agreed that ANDERSON must "work off" the debt incurred for stealing the drugs. I believe that "work off" is coded language to mean sell more drugs without pay on behalf of the organization. CRAWFORD then stated that ANDERSON had made an error when selling Ronald MCCORMICK's drug's ("I think dummy had something to do with it too though. Cause he kept fucking up dummy's shit. Why would you keep giving him shit to fuck up. You know he fucked dumb dumb's shit a couple times?"). I know that one of MCCORMICK's aliases is "Dummy." JOHNSON replied that he did not know that ANDERSON had messed up MCCORMICK's drug sales. CRAWFORD then inferred that the reason ANDERSON was working off MCCORMICK's drug debt was because MCCORMICK has

23

"tattoos on his face," which implies that he is violent. CRAWFORD and JOHNSON then agreed to meet.

45.     On February 5, 2019, at approximately 8:32 p.m., Brandon CRAWFORD, utilizing TARGET TELEPHONE 7, called 410-814-9577, a telephone utilized by Robert ANDERSON, a/k/a "Rock." During the call, CRAWFORD asked, "Hey where you get sixty from yo?" ANDERSON replied, "I thought, I thought we was going to…" CRAWFORD asked, "No I'm just saying where did you get that from. Did I say that? Or did you just make that up yourself?" ANDERSON replied, "Nah, the last time you did that so I figured." CRAWFORD stated, "Nah. No, you can't, you can't figure and assume. Last time you figured man. You still owe me from last you figured." ANDERSON stated, "You right, you right. The pink things. For the pink things." CRAWFORD stated, "You still owe me from the last time you assumed. Don't assume my nigga. We need, maybe we need (inaudible) for now on we gonna talk about it before hand." ANDERSON replied, "Okay." CRAWFORD stated, "But no, that's not, that's not what I was trying to do with that. But we'll talk about it. Definitely. Not over the phone." ANDERSON replied, "Alright." In this call, I believe CRAWFORD called ANDERSON to confront ANDERSON about owing CRAWFORD drug proceeds. ANDERSON tried to explain he thought his share of the proceeds was greater and CRAWFORD admonished ANDERSON, telling him he would discuss the arrangement with him later, but not on the phone. From training and experience, I know that drug traffickers try to avoid discussing drug transactions in depth over the telephone in the event that law enforcement is intercepting the phone.

46.     Several minutes later, at approximately 8:25 p.m., Brandon CRAWFORD, utilizing TARGET TELEPHONE 7, called TARGET TELEPHONE 1, a telephone utilized by Antonio JOHNSON.   During the conversation, CRAWFORD complained to JOHNSON about

24

ANDERSON, referring to him as "Rock." CRAWFORD said he believed ANDERSON tried to cheat him, saying that, "...[ANDERSON] think he be slick. Mess up. And try to play dumb..." JOHNSON acknowledged, stating, "He gonna get himself hurt." Further into the call, CRAWFORD elaborated that ANDERSON had tried to "sixty, forty" him. I know that a 60:40 split in drug proceeds between a drug supplier and a drug distributor is one type of common profit sharing arrangement in Baltimore. I believe CRAWFORD was telling JOHNSON that ANDERSON attempted to short CRAWFORD by claiming a 60:40 profit sharing split.









50.    During the investigation, investigators learned that CRAWFORD was staying most nights at 3106 Oakford Avenue, Baltimore, Maryland 21216 (**TARGET LOCATION 1**). A check through Maryland Taxation and Assessment revealed the listed property owner of the property to be Stark Investments. CRAWFORD is the Resident Agent for this company.

51.    On June 20, 2019 at approximately 4:45 p.m., investigators were conducting surveillance of 3106 Oakford Avenue, Baltimore, Maryland 21216 when investigators observed CRAWFORD arrive in a black in color Nissan sedan. CRAWFORD was then observed utilizing a key to enter **TARGET LOCATION 1**.

### B) TARGET LOCATION 2: 3907 Bonner Road, Baltimore, Maryland 21216

52.    **TARGET LOCATION 2** is another residence used by CRAWFORD. A query of property records indicates that CRAWFORD's mother, Patricia CRAWFORD, also lives at this location and is currently listed as the owner of the property according to Maryland Department of Taxation and Assessments. The investigation has revealed, however, that CRAWFORD frequently travels to this location and has met members of the DTO at **TARGET LOCATION 2**.

53.    For example, on December 8, 2018, at approximately 11:42 a.m., TARGET TELEPHONE 1, a phone used by Antonio JOHNSON, received a call from 443-819-6663, a telephone utilized by CRAWFORD. During this call CRAWFORD asked, "Black man, where the hell you been at black man?" JOHNSON replied, "Shit, in that mother fucker for real. And then my mother's shit." CRAWFORD asked, "Yo what's up? You haven't been yourself. You alright

28

yo? You need something? What's up?" JOHNSON replied, "Shit. I need to get up with you for real. Fuck you at?" CRAWFORD stated, "Shit, I'm at my mother house." JOHNSON stated "Alright so I'm coming up Norfolk. I'm about to grab my food from the breakfast spot." CRAWFORD stated "Alright, I'm around here." JOHNSON asked, "You got the kids?" CRAWFORD stated "Yeah my daughter in here." JOHNSON replied, "Shit I'm about to come up there (inaudible)."

54. I believe that during this call that CRAWFORD asked JOHNSON if he needed any drugs ("You alright yo? You need something?") JOHNSON said that he needed to meet with CRAWFORD. CRAWFORD told JOHNSON that he was at his "mother's house," **TARGET LOCATION 2**. JOHNSON then asked if CRAWFORD had his kids at **TARGET LOCATION 2**. I believe JOHNSON asked because he was planning on traveling to the location to obtain drugs and did not children to be present during the meeting. At approximately 12:16 p.m., JOHNSON received a call from JOHNSON. During the call, JOHNSON confirmed that he was on his way to **TARGET LOCATION 2**.

55. On February 13, 2019 at approximately 4:03 p.m. CRAWFORD, utilizing TARGET TELEPHONE 7, called 410-542-2843, a telephone utilized by Patricia CRAWFORD. During this call, CRAWFORD asked his mother if she changed the security code for her residence. CRAWFORD's mother then provided CRAWFORD with the new security code for **TARGET LOCATION 2**. I believe CRAWFORD obtained the security code so he could access the residence in his mother's absence.

56. On March 4, 2019, at approximately 10:13 a.m., CRAWFORD, utilizing TARGET TELEPHONE 10, called his mother at 410-542-2843. During this conversation, CRAWFORD asked his mother what time her nurse was coming to her residence. CRAWFORD detailed how

29

he had to move "some of that stuff upstairs." CRAWFORD's mother did not know that time the nurse was coming to the residence, and CRAWFORD stated that he would be at her residence shortly. From the context of the call, I believe CRAWFORD wanted to know when a nurse was visiting **TARGET LOCATION 2** so he could move drugs (referring to it as "stuff") to a more hidden location in the house. I believe CRAWFORD was referring to drugs based on the overall investigation, as well as the fact that CRAWFORD wanted to move the property before a nurse arrived.

57.     Investigators have learned that CRAWFORD uses Limited Liability Companies ("LLCs") to hold his property and other assets. I know through my training, knowledge, and experience that it is a common for drug traffickers to use LLCs to hide assets from being identified and seized by law enforcement. A query through the Maryland Department of Taxation and Assessment revealed one of CRAWFORD's LLC's as Stark Investments, LLC, a company formed in 2013. During the formation, the LLC's address was listed as **TARGET LOCATION 2**. In June 2018, the LLC filed for reinstatement with the State of Maryland. At this time, CRAWFORD listed himself as the Resident Agent, and with the address again listed as **TARGET LOCATION 2**.

## C) TARGET LOCATION 3: 4048 Hilton Road, Second Floor, Baltimore, Maryland 21215

58.     **TARGET LOCATION 3** is the residence of Ronald MCCORMICK. On January 27, 2019, at approximately 9:28 p.m., Ronald MCCORMICK, utilizing TARGET TELEPHONE 3, received a call from 747-228-6092, a telephone being utilized by an unknown male (further referred to as UM 6092). During this call, UM 6092 asked, "Where you at?" MCCORMICK responded, "My shit for real?" UM 6092 asked, "You chillin' tonight?" MCCORMICK responded, "Where you going at?" UM 6092 replied "Select." Both parties talked about Select Lounge and

30

UM 6092 stated, "I'm taking, I'm taking the joint with me though yo." MCCORMICK responded, "I got you, I got you." UM 6092 asked, "You got something small or what?" MCCORMICK responded, "Nah, I only got the uh, the uh…" UM 6092 stated, "We need like the baby. We need something like a baby something. I can get it in if it's small." MCCORMICK stated, "My nigga I'm working on that, I'm working on that. I'm in the process of working on trying to get all babies right now." UM 6092 stated, "Yeah yo. Cause we need to get; I can get in with a lot of shit yo." MCCORMICK replied, "That shit's crazy that you. Cause you feel like, um, um, give me like, as soon as I get in the house I'm gonna call your phone." UM 6092 replied, "Alright". MCCORMICK stated, "But yeah, I'm trying to get, make sure, you feel me, everybody Gucci now."

59.     During this call, UM 6092 told MCCORMICK that he was going to Select Lounge, a club in Baltimore, and that he was planning on being armed with a firearm in the club ("I'm taking the joint with me though yo."). UM 6092 asked if MCCORMICK had a smaller framed firearm ("You got something small or what"), and MCCORMICK's reply inferred that he only had a regular or larger-sized firearm. Both parties then talked about how they needed to get small ("baby") firearms so they can be more easily concealed. MCCORMICK stated that he was working on obtaining these firearms when UM 6092 called.

60.     On March 29, 2019, at approximately 8:45 a.m., investigators conducted surveillance of MCCORMICK's residence located at 4048 Hilton Avenue, Baltimore, Maryland (**TARGET LOCATION 3**). At around this time, Lewis HAYWARD had spoken to MCCORMICK. From prior interceptions, investigators know that MCCORMICK often communicates by phone with HAYWARD to check if HAYWARD has arrived at the drug shop. At approximately 9:09 a.m., investigators observed MCCORMICK walk out of **TARGET LOCATON 3** while carrying a book bag. MCCORMICK then got into a sedan bearing a "Lyft"

31

a location to store and distribute cutting agents and packaging materials utilized by drug traffickers to prepare and package drugs for street sale.

63.     Interceptions have revealed that MCCORMICK appears to work at **TARGET LOCATION 4** while also managing street-level drug distribution conducted in the area. Investigators have conducted surveillance on numerous occasions at the business, while also monitoring the social media accounts of the targets of this investigation which posted numerous pictures of themselves.   An example of this occurred on April 21, 2019 when Ronald MCCORMICK posted a picture to his Instagram account, which pictured him standing in front of **TARGET LOCATION 4**:



64.     On January 22, 2019, at approximately 7:56 p.m., Ronald MCCORMICK, utilizing TARGET TELEPHONE 3, received a call from telephone number 443-679-2395, a telephone

utilized by Robert JONES. During this conversation, JONES asked "You got a whole one of them around there?" MCCORMICK replied, "Think so. Hold up, hang up, let me call you right back." At approximately 7:58 p.m., Ronald MCCORMICK, utilizing TARGET TELEPHONE 3, called 443-257-9209, a telephone being utilized by Sean WESTON. During this conversation WESTON answered, "What's up Bunk?" MCCORMICK replied, "Cooling. You, you down at the store?" WESTON stated, "Nah, I'm just coming from Pennsylvania. But I'm on my way down there though. Why what's goin on?" MCCORMICK stated, "Nothing. I, uh, was going to see if you had a box for real for real?" WESTON asked, "A box?" MCCORMICK replied, "Yeah." WESTON asked "What kind of box?" MCCORMICK stated, "Uh, you know. A box. A block box." WESTON stated "Box, box, black box?" MCCORMICK stated, "No I said a block box." WESTON stated "Oh a block box?" MCCORMICK replied, "Yeah, yeah." WESTON asked, "What the fuck is a block box?" MCCORMICK stated, "You know what I'm talking about cuzzo." WESTON stated "Block box? I'm lost right now." MCCORMICK stated, "Yo, yo the blocks yo. The blocks." WESTON replied "Oh, oh, oh, a case?" MCCORMICK stated, "Yeah." WESTON stated, "Oh you talking about you trying to get a case? Oh no I don't got a case. Why didn't you say case nigga?" MCCORMICK started laughing "Oh I just say a box. My bad." WESTON replied, "I don't know what the fuck you talking about a box."

65.     On January 22, 2019 at approximately 8:01 p.m. Ronald MCCORMICK, utilizing TARGET TELEPHONE 3, made an outgoing telephone call to telephone number 443-679-2395, a telephone being utilized by Robert JONES. During this conversation MCCORMICK stated, "Hey dummy these mother fuckers locked the spot up on me for real for real. I can get, I can grab, bring them up in the morning." JONES stated, "Alright just hit me up in the morning." MCCORMICK stated "Alright, I was about to say it will be early." JONES replied, "Alright."

66.    Based on the above-described calls, I believe that JONES had asked for a large quantity of cutting agents. MCCORMICK then told JONES that he would have to find out if he could obtain the quantity that JONES wanted. MCCORMICK then called Sean WESTON, who was confused by the coded language MCCORMICK use. Eventually, WESTON appeared to understand, but told MCCORMICK he did not presently have a "case," which I believe means a box/case of cutting agents. MCCORMICK then called JONES back and told JONES that he would call him the next day to supply JONES. On April 3, 2019 investigators later arrested JONES, and executed warrant at a residence JONES was utilizing.    During the execution of the warrant, investigators seized over one kilogram of fentanyl, two handguns, approximately $90,000.00 in United States currency, and a large amount of drug packaging material and cutting agents.

67.    On March 29, 2019, at 9:48 a.m. (following the DEA's seizure of suspected narcotics from MCCORMICK), Ronald MCCORMICK, utilizing TARGET TELEPHONE 3, called Cornelius CARROLL. From the investigation, CARROLL has been identified as the ostensible owner/operator of Opaque, the business located at **TARGET LOCATION 4**. Prior to the call being answered by CARROLL, MCCORMICK was heard speaking to an unknown individual in the background stating, "They took them." The call is answered and MCCORMICK stated, "Hey cuzzo?" CARROLL replied, "Yeah." MCCORMICK stated "Clean it up. Call Dukie…" CARROLL stated, "I didn't' hear you." MCCORMICK stated, "Call Dukie. Clean it up." CARROLL replied, "It's on deck." MCCORMICK stated "Huh? No. Clean it up." CARROLL replied, "Oh yeah?" MCCORMICK stated, "Nigga I just left out my house. I'm about to go to New York. I'm on my way up to uh, to the studio on the D1 shit, whatever in New York. And they pulled me over in my Lyft. Getting to talking about Sean and the Bentley, and all this other shit. I said look man, I don't know anything about no cut man. I just work at the store."

35

CARROLL asked, "What happened?" MCCORMICK stated "Man they just pulled me over. And asked me about the store on Arydale. I said shit I just work there. You feel me? I don't know nothing about no cut, or nothing like that. You feel me? I'm on my way to New York. You feel me? So look, all I can tell you all is I don't know what you want me to tell you. You feel me and then the white boy was like it's just blatant. We know what's going on, we got it out the store, you know what I'm saying, so just tell your friend Sean he just doing too much. And the community has a lot to say about it." CARROLL asked, "Are you serious?" MCCORMICK stated, "Nigga just now! Nigga. They just let me go. Took my Molly and told me to roll the fuck out." CARROLL replied, "Damn. And they say the community got a lot to say about it?" MCCORMICK replied, "The community got a lot to say about it yo. You feel me? Real shit. They say the, the, the community, the community watch or some shit the community got a lot to say about it or some shit. They took my drugs, and told me to roll the fuck out." CARROLL asked, "And they talking about him?" MCCORMICK replied, "Yeah." CARROLL asked, "And nobody else?" MCCORMICK replied, "Nobody else but him. The said he too (inaudible)." CARROLL stated, "It's his mouth man." MCCORMICK replied, "Yeah they said he too blatant. They said he's too blatant. They said he, what he say, they said, the nigga just told me yo, there was three of them. Nigga I came out of my house, as soon as I got into my Lyft, I pulled off and got pulled right over." CARROLL replied "Let me call you right back."

68. I believe that during this call that MCCORMICK told CARROLL how law enforcement had seized the drugs he brought out of **TARGET LOCATION 3**. MCCORMICK explained that the law enforcement officer had told him the seizure pertained to community complaints involving the sale of cutting agents at **TARGET LOCATION 4**, which are sourced Sean WESTON. MCCORMICK said he disclaimed any knowledge about the store and said he

36

just worked there. MCCORMICK and CARROLL then speculated that the community complaints likely arose due to Sean WESTON's personality and how he interacts with people.

69.    On March 29, 2019, at approximately 10:14 a.m., MCCORMICK, utilizing TARGET TELEPHONE 3, called Antonio JOHNSON, who was utilizing TARGET TELEPHONE 1. During the call MCCORMICK stated, "I'm mad as shit. But this trip just saved my life. I ain't even gonna lie. Fucking with this nigga Sean yo." Further into the conversation MCCORMICK stated, "Yo how they just pull me over coming out that motherfucking house talking about Sean my nigga?" JOHNSON replied, "Huh?" MCCORMICK stated, "Motherfucker just pulled me over coming out the house talking Sean. Checking me for cut and shit." JOHNSON replied "Hold up yo I'm about to be right there." I believe that during this conversation between MCCORMICK and JOHNSON that MCCORMICK was alerting JOHNSON that the police had stopped him, asking him questions concerning "Sean" and "cut." Like the call with CARROLL, I believe MCCORMICK was explaining to JOHNSON that the stop was a result of Sean WESTON and distribution of cutting agents at **TARGET LOCATION 4**. JOHNSON then told MCCORMICK he would speak to him in person.

### E) TARGET LOCATION 5: 8624 Glen Hannah Court, Windsor Mill, Maryland 21244

70.    During the investigation into the Opaque store located at **TARGET LOCATION 4**, investigators identified **TARGET LOCATION 5** as the residence of Sean WESTON. Investigators also identified a second location that WESTON was also supplying/distributing large amounts of drugs packaging materials and cutting agents, a store called the "North-West Variety Store" located at 1338 W. North Avenue, Baltimore, Maryland. A query through the Maryland Department of Taxation and Assessment revealed the owner of the business is Sean WESTON.

71.     On March 26, 2019, investigators learned that members of the Baltimore Police Department's Western District Action Team had executed a search and seizure warrant at this location. The warrant was a result of an investigation conducted into this location concerning the distribution of drug paraphernalia. A search of the residence revealed large amounts of cutting agents utilized by drug traffickers to process their drugs for street level distribution, electric weighing scales, metal strainers with residue, a metal whisker, various packaging material utilized by drug traffickers to package and distribute illegal drugs, razor blades, along with a 12 gauge Mossberg shotgun, and 12 gauge ammunition.

72.     On March 28, 2019 investigators were reviewing Sean WESTON's Instagram account (seanwn6927) and observed that WESTON posted a video of the BPD conducting the search warrant at his store. WESTON wrote, "Now look what they did to my son 3 minutes latter, what did they do with my son, they put him behind the conter and gave him a bunch of charges they made up...please share this is the Baltimore city police..."A photo of this video is below:





73.     On June 14, 2019, PayPal, Inc., provided transaction history for WESTON pursuant to an administrative subpoena. PayPal supports online money transfers and serves as an electronic alternative to traditional paper methods such as checks. PayPal allows users to conduct transactions, using PayPal as the processor for the payment. PayPal records reveal that WESTON has used the TARGET ACCOUNT to conduct the following online purchases using PayPal from the period of September 1, 2016 through April 17, 2019:

| DATE | COMPANY | AMOUNT |
|------|---------|--------|
| 03/24/2019 | CAPSULINE | $2,593.23 |
| 01/30/2019 | CAPSULINE | $2,570.99 |
| 01/06/2019 | CAPSULINE | $1,960.63 |
| 01/02/2019 | CAPSULINE | $1,753.89 |
| 12/22/2018 | CAPSULINE | $880.49 |
| 11/24/2018 | CAPSULINE | $1,132.09 |
| 10/16/2018 | CAPSULINE | $1,209.27 |
| 05/17/2018 | HERB SUPPLY COMPANY[3] | $735.00 |
| 11/14/2017 | EMPTY CAPS COMPANY[4] | $599.70 |
| 05/15/2017 | EMPTY CAPS COMPANY | $846.25 |
| 01/25/2017 | EMPTY CAPS COMPANY | $652.15 |
| | TOTAL | $14,933.69 |

74.     Investigators learned that "CAPSULINE" is an online merchant specializing in the sales of gelatin capsules. Upon searching CAPSULINE's website, investigators learned that the merchant sells "bulk" amounts of gelatin capsules. Investigators learned that the approximate bulk price for 75,000 gelatin capsules is approximately $600.00.

75.     Investigators learned that WESTON purchased TARGET LOCATION 5 in 2007 for $630,000. On June 27, 2019, investigators monitoring WESTON's social media observed a

---

[3] Cap-M-Quick Capsule Filling Machine with TAMPER SIZES 000-00-0-1-2-3-4
[4] Size 0 Plastic Capsule Filler

video that he posted which showed the construction of a large outdoor grill. The video depicts what appears to be the rear of **TARGET LOCATION 5.** In the post WESTON wrote, "...I'm finally getting around to building one that will literally last a lifetime."

### F)  TARGET LOCATION 6: 3922 Fairview Avenue, Baltimore, Maryland 21216

76.    **TARGET LOCATION 6** is the residence of Ivan POTTS.[5] During the investigation into LNG, investigators identified the BGF leader operating for the area as Ivan POTTS, a/k/a "Spottie." From court-authorized interceptions of POTTS' cellular telephone, investigators intercepted communications which revealed POTTS' leadership role within the BGF, his marijuana distribution activities, and discussions regarding the illegal possession of firearms.

77.    On January 15, 2019, at approximately 12:15 p.m., LNG member Marcus HALL, utilizing TARGET TELEPHONE 5, called TARGET TELEPHONE 9, a phone used by POTTS. After exchanging pleasantries, HALL asked, "Hey, bro. You got some new shit?" POTTS replied, "Yeah, but they higher. I got some gas. HALL then attempted to clarify asking, "Higher?" POTTS responded, "Yeah, (inaudible). HALL then asked, "How much?" POTTS appeared to answer, "145." HALL aske,d "You said 145?" POTTS said, "I said 175." HALL then said, "Oh, 175." POTTS said, "Yeah. It's gangsta. It's gonna be better than the last shit." HALL then asked, "Where you at?" POTTS responded, "At the house." HALL then said, "I am basically right there. Come to the door." POTTS said, "Okay," and the call ended.

78.    I believe that in this call that HALL called POTTS to obtain high-grade marijuana. POTSS said he had a new type of marijuana that was of a higher quality. HALL and POTTS then

---

[5] During the month of July 2019, a DEA investigator spoke to the owner of **TARGET LOCATION 6** about whether the residence was subdivided or had any separate units within the residence. The owner stated that the residence is one single residence.

40

discussed the price. POTTS then elaborated on the quality of the drugs, saying that it was better than the last batch of drugs given to HALL. POTTS and HALL then coordinated meeting for the drug transaction. HALL then asked for POTTS' location. POTTS said he was at his house, which I believe meant **TARGET LOCATION 6**. HALL then said he would be there momentarily and told POTTS to come to the door.

79.     On February 2, 2019, at approximately 9:50 a.m., POTTS, utilizing TARGET TELEPHONE 9, received a call from 410-240-1627. A phone utilized by an unidentified male (further referred to as UM 1627). During the call, UM 1627 asked, Alright, Hey Yo, what kinda whatcha callit you got yo?" I believe this was a coded reference to a firearm. UM 1627 further said he was trying to find a magazine for that firearm, but needed to know what kind of firearm it was. UM 1627 further asked, "It's a Sig ain't it?" POTTS responded, "No, it's a Glock." UM 1627 clarified, "No, not your shit. I'm talking about Linwood's shit." POTTS responded, "Oh, he got a Sig." The call also continued about UM 1627 trying to determine the exact model and how he was trying to go to the store. I believe that POTTS thought during the call that UM 1627 wanted to know what kind of gun that POTTS owned, prompting him to say he owned a "Glock," a brand of firearm. UM 1627 clarified he meant he wanted to know what kind of gun "Linwood" owned. I believe UM 1627 was referring to Linwood DAVIS, a member of LNG and BGF. POTTS confirmed that Linwood owned a "Sig," meaning the Sig Sauer brand. POTTS has a felony conviction and is prohibited from possessing firearms.

80.     On February 8, 2019 at approximately 5:11 p.m. Ivan POTTS, utilizing TARGET TELEPHONE 9, received a call from TARGET TELEPHONE 12. During the call, POTTS stated, "I'm a put it up. I'm going to put it together for you." DAVIS asked, "You already put it together? I'm coming back, I'm on my way back right now." POTTS replied, "Alright." Further into the

conversation DAVIS asked, "What you going to take it with you for me?" POTTS stated, "Nah, hell nah. I ain't walking with all this shit." DAVIS asked, "Oh you walkin?" POTTS stated, "Yeah I'm walking." DAVIS stated, "How am I gonna get it from you, I need it now. Hella people..." POTTS stated, "Then come and get it." POTTS and DAVIS then agreed to meet.

81.     I believe that during this call that DAVIS was arranging to obtain drugs from POTTS. From training and experience, I know the phrase "putting it together" is a common drug trafficking phrase to refer to assembling or packaging drugs for distribution. POTTS then told DAVIS he would not carry the drugs with him to the meeting location ("I ain't walking with all this shit.") I know that drug traffickers often do not want to carry drugs on their persons out of fear that law enforcement will stop them while in possession of the drugs, or because rivals may rob them of the drugs. DAVIS indicated he need the drugs immediately because he had "hella people," which I believe meant customers waiting on DAVIS. POTTS then told DAVIS to come to him to obtain the drugs, which I believe meant that DAVIS should come to POTTS' residence, **TARGET LOCATION 6**.

82.     On February 10, 2019, at approximately 4:04 p.m., POTTS, utilizing TARGET TELEPHONE 9, received a call from 443-673-4553, a telephone believed to be utilized by Moses LEWIS. During the call LEWIS asked, "Hey yo, you um still good on the broccoli?" POTTS replied, "Yeah." LEWIS stated, "Alright, alright. If I grab two, can you through me one?" POTTS replied, "Yeah." LEWIS asked, "Huh?" POTTS again stated, "Yeah." LEWIS stated, "Alright, I wanted two." POTTS replied, "Alright, I got you." LEWIS stated, "Alright, I'll be there in a little bit."

83.     I believe through my training, knowledge, and experience as a drug investigator that during the above described intercepted communication between POTTS and LEWIS that

wished LEWIS had an iPhone so that they could FaceTime. I believe POTTS said this because he knows law enforcement cannot intercept FaceTime communications. LEWIS then said he would use Instagram messenger. I believe that LEWIS told POTTS he needed a new gun because he had used his recently. I know that it is common for individuals involved in acts of violence to rid themselves of their weapons so they are not arrested with a weapon that can be tied to an act of violence they committed.

86.     On February 23, 2019 at approximately 2:57 p.m., POTTS, utilizing TARGET TELEPHONE 9, received an incoming telephone call from 443-953-3854, telephone believed to be utilized by Moses LEWIS. During the call POTTS asked, "Who this?" LEWIS replied, "This Moe. Why you never locked me in man?" POTTS stated, "Oh shit I must have locked the wrong number in yo." LEWIS stated, "Hey yo?" POTTS replied in the positive. LEWIS stated, "Try to find me some food for that bitch yo." POTTS replied, "I got you yo, I got you. I'm on top of it now." LEWIS asked, "How long is it gonna take?" POTTS stated, "I'm on top of that shit today. I'm on top of it." LEWIS stated, "I gonna have to stay in the house. (Inaudible) stay in the house." POTTS replied, "Alright I got you." LEWIS stated, "I hate (inaudible). Fuck that." POTTS stated, "Hey yo, stop talking over these phones too yo." LEWIS stated, "Yeah I ain't really saying shit though." POTTS stated, "I'm just saying." LEWIS stated, "Yeah I know. But I don't want you bluff." POTTS stated, "I got, come on yo, you know I'm going to do that. Man, I'm going to call you." LEWIS stated, "Alright."

87.     I believe that during this call that LEWIS used coded language to tell POTTS that he needed more ammunition for the firearm that he was in possession of currently ("Try to find me some food for that bitch yo."). POTTS told LEWIS that he was working on getting the ammunition for LEWIS. LEWIS told POTTS that he had to stay inside his residence. I believe

44

LEWIS was telling POTTS that he had to stay inside his residence because he does not want to be outside without being armed. POTTS reminded LEWIS to not speak over the telephone. I believe POTTS did so just in case law enforcement may be listening to the telephone conversations.

88.     On February 26, 2019, investigators were notified by BPD Homicide Division that it had obtained an arrest warrant for LEWIS for murder. On February 27, 2019, investigators were monitoring the court ordered GPS location data over LEWIS's cellular telephone and determined that LEWIS was in the area of the 1600 block of Argonne Drive, Baltimore, Maryland. At approximately 10:00 a.m., surveillance was established in this area. At approximately 10:27 a.m., LEWIS walked out of 1637 Argonne Drive. Investigators then attempted to initiate an arrest of LEWIS outside the residence, during which time LEWIS reached into his waistband area and removed a semi-automatic handgun and threw it to the ground. LEWIS also attempted to discard a cellular telephone. Investigators were then able arrest LEWIS on the outstanding arrest warrant.

89.     On February 28, 2019, at approximately 6:52 p.m., POTTS, utilizing TARGET TELEPHONE 9, received an incoming call from an unknown woman. The female asked POTTS if he was at Garrison and Liberty Heights. POTTS asked the female if she wanted him to "text" her his address, and the unknown woman responded "yes". A brief moment later, POTTS sent a text/SMS message to the woman. The content of the message was "3922 Fairview."

90.     A check through law enforcement databases revealed that POTTS utilized the address 3922 Fairview Avenue, Apartment 3, Baltimore, Maryland 21216 (**TARGET LOCATION 6**) as recently as April 7, 2019, reported to Experian Credit Agency.

91.     On June 28, 2019 at approximately 6:07 p.m., investigators conducted video surveillance of 3922 Fairview Avenue, Baltimore, Maryland and observed POTTS enter **TARGET LOCATION 6**, utilizing a key to gain access.

45

### G) TARGET LOCATION 7: 4002 Fairfax Road, Baltimore, Maryland 21216

92.     **TARGET LOCATION 7** is a residence used by Michael WILLIAMS, a/k/a "Mega," to store suspected narcotics and contraband. During the investigation into the LNG organization, investigators identified Michael WILLIAMS as a drug distributor for the group. From the court-authorized WILLIAMS' cellular telephone, investigators intercepted conversations on an almost daily basis that indicated WILLIAMS participated in drug distribution. Several conversations in reference to firearms were also intercepted.

93.     On May 7, 2019, at approximately 4:51 p.m., Michael WILLIAMS, utilizing TARGET TELEPHONE 12, received a call from 443-208-6377, a telephone utilized by "UM 6377". During the call, UM 6377 asked, "Yo where you at?" WILLIAMS responded, "Going up Liberty Road." UM 6377 responded, "Tony said you supposed to be bringing something back." WILLIAMS replied, "No, I ain't even tell him. I don't even know where it's at to bring it back." UM 6377 stated, "Alright you on some shit, alright." I believe that during this call that WILLIAMS and UM 6377 were discussing bringing back drugs for UM 6377 to distribute. UM 6377 said that "Tony" told him that WILLIAMS was bringing him drugs. Based on the context of the call, I believe "Tony" referred to Antonio JOHNSON as that is one of his nicknames.

94.     On May 4, 2019, at approximately 9:14 a.m., Michael WILLIAMS, utilizing TARGET TELEPHONE 12, received a call from telephone number 443-208-6377. During this conversation, UM 6377 asked, "Yo what you ready to do?" WILLIAMS stated, "I'm about to get them cannons and pull up there." UM 6377 asked, "You said what?" WILLIAMS replied, "I'm about to get the guns from Andrew and pull up there."

95.     I believe that during this call that WILLIAMS was telling UM 6377 that he was about to arrive with "cannons," which I believe is a coded term for guns. When UM 6377 did not

46

appear to understand, WILLIAMS clarified that he meant guns. WILLIAMS said he was obtaining the guns from an unidentified person only known as "Andrew" and would bring them to a secure location. Investigators later determined that **TARGET LOCATION 7** is a storage location to store contraband for LNG members.

96.     On May 5, 2019, at approximately 10:10 p.m., Michael WILLIAMS, utilizing TARGET TELEPHONE 12, called 443-208-6377. During this call WILLIAMS stated "Hey yo come out front real fast. And bring me um, like uh, thirty dollars' worth of girl." UM 6377 replied "Alright." I believe that WILLIAMS was telling UM 6377 to come out of the storage location and supply him with $30 in cocaine. I know "girl" is a common street term for cocaine.

97.     On March 20, 2019 at approximately 8:34 p.m., Michael WILLIAMS, a/k/a "Mega," utilizing TARGET TELEPHONE 12, called 443-522-5848, a phone utilized by "UM 5848." After exchanging pleasantries, WILLIAMS asks, "Where are you at?" UM 5848 says, "I'm over east." WILLIAMS says, "I need ya. I need uh ten of them uh, ten hard dog foods." UM 5848 says, "You keep getting all this extra shit, you get what you pay for here. WILLIAMS said, "Alright. I'm at my mother's shit. I ain't got no car so I can't come over." UM 5848 said, "Alright, let me take of what I'm doing right here, and I be over." WILLIAMS said, "Say what?" UM 5848 said, "Let me take care of what I'm taking care over right here, and I'll be over." WILLIAMS said, "Alright."

98.     I believe that during the call, WILLIAMS asked UM 5848 for ten units of heroin. I know the term "dog food" is a common street reference to heroin, specifically, heroin that is brown colored. When UM 5848 told WILLIAMS, "You keep getting all this extra shit, you get what you pay for here," I believe he meant that WILLIAMS was asking for more drugs than he had paid for.

47

99.    During the investigation, interceptions of WILLIAMS' phone indicated that he was storing drugs at **TARGET LOCATION 7**, which is also a residence where WILLIAMS' mother resides. Investigators installed a covert surveillance camera near **TARGET LOCATION 7**. Surveillance from beginning May 2, 2019 to the present has showed WILLIAMS and other LNG members, including JOHNSON and POTTS, enter and exit **TARGET LOCATION 7** on a nearly daily basis. Based on my training and experience, I believe these brief in duration visits to the residence are consistent with the location being used to store drugs.

100.    Below are several photos from some of the video recorded from the location:



*May 4, 2019*



*May 12. 2019 – WILLIAMS was observed walking out of TARGET LOCATION 7 and engaging in a suspected hand-to-hand drug transaction*



*May 29, 2019*

101.    Investigators have also subpoenaed lease records for WILLIAMS's residence, **TARGET LOCATION 8**. WILLIAMS listed his mother, Michele ANDERSON, as an emergency contact, and provided telephone number 410-949-5863. During the course of the

49



investigation, ANDERSON was intercepted utilizing that cellular telephone to speak with WILLIAMS. ANDERSON has a listed address of **TARGET LOCATION 7.**

**H) TARGET LOCATION 8: 10005 Mill Centre Drive, Apartment 487, Owings Mills, Maryland 21117**

102.    **TARGET LOCATION 8** is the residence of Michael WILLIAMS. Through court-authorized GPS data obtained from WILLIAMS' cellular telephone, investigators learned that on most nights he slept in the area of 10005 Mill Centre Drive, Owings Mills, Maryland, 21117 **(TARGET LOCATION 8)**.

103.    On March 20, 2019 at approximately 9:35 a.m., Michael WILLIAMS, a/k/a "Mega," utilizing TARGET LOCATION 12, received a call from 443-522-5848, used by "UM 5848." After exchanging pleasantries, UM 5848 asked, "You around your mother's way?" WILLIAMS says, "Nah, not yet?" UM 5848 then said, "Boy, it takes forever to get to the city." WILLIAMS says, "I'm putting this shit together, I'm capping shit." UM 5848 said, "Alright." The call then ended I believe that in this call that UM 5848 was asking WILLIAMS if he was at **TARGET LOCATION 7**, his mother's house. When WILLIAMS said he was not there, UM 5858 said it takes WILLIAMS a long time to get into the city, meaning that he knew WILLIAMS resides outside Baltimore City. WILLIAMS then said he was "capping shit," which I believe meant he was packaging narcotics into gel capsules. GPS data for WILLIAMS' phone showed that the phone was in the vicinity of **TARGET LOCATION 8** during the time of this call. Therefore, I believe that WILLIAMS packages narcotics at **TARGET LOCATION 8**.

104.    On March 22, 2019, at approximately 9:37 a.m., WILLIAMS, utilizing TARGET TELEPHONE 11, called an unidentified woman at 470-449-2833 ("UF 2833"). During this call WILLIAMS asked, "I said what's the mailbox. Which one is the mail, which one is our

mailbox?" UF 2833 replied, "What you mean?" WILLIAMS asked, "Our mailbox, is our address?" UF 2833 replied, "Yes." WILLIAMS asked, "Why this key won't open it?" UF 2833 replied, "It's in the middle, the middle." WILLIAMS asked, "Why does the key not open the box?" UF 2833 and WILLIAMS continue talking about the key not opening their mailbox. Further into the conversation, UF 2833 asked, "Are you at port, apartment 487 in the middle?" WILLIAMS replied, "Oh nevermind."

105.    From the context of the call, I believe WILLIAMS was trying to open his mailbox at **TARGET LOCATION 8**, but was having difficulty. WILLIAMS asked UF 2833 to confirm the mailbox. UF 2833 confirmed that the mailbox was the same as WILLIAMS' apartment number, 487. During this conversation, court-authorized GPS data for WILLIAMS' phone indicated that he was in the vicinity of **TARGET LOCATION 8**.

106.    On April 10, 2019, at approximately 10:23 a.m., WILLIAMS, utilizing TARGET TELEPHONE 11, received a call from 410-314-8177, a telephone utilized by an unidentified woman ("UF 8177"). During the call, UF 8177 asked WILLIAMS, "You good with the boy?" WILLIAMS replied, "Yeah." UF 8177 asked "You meet me at my place? You still home? You still in the County?" WILLIAMS replied, "Yeah. That's crazy I'm about to put my shit on now. I'll stop right there." The female replied, "That's all I need."

107.    I believe that during this call that UF 8177 asked for heroin, referring to it by the common street term "boy." WILLIAMS confirmed that he had heroin. UF 8177 asked if WILLIAMS was "home" and "…still in the County." WILLIAMS confirmed that he was and would stop by to meet UF 8177 to conduct the drug transaction. Therefore, I believe WILLIAMS meant that he was home at **TARGET LOCATION 8** and in possession of heroin for sale.



108.    On June 7, 2019 investigators served an administrative subpoena on "The View at Mill's Run" which is the apartment complex located where **TARGET LOCATION 8** is located. Investigators learned that WILLIAMS' was listed as a resident for Apartment 487 and investigators were provided the lease for this location. On the lease, WILLIAMS listed his mother Michele ANDERSON as an emergency contact.

### I)    TARGET LOCATION 9: 3955 Bonner Road, Baltimore, Maryland 21216

109.    **TARGET LOCATION 9** is the residence of Marcus HALL, a/k/a "Lor Pill," a member of LNG. HALL is a street-level drug distributor in the organization. HALL also promotes his membership in LNG and BGF on Instagram. For example, HALL will reference LNG, YBG, and use common symbols of BGF, such as the black heart, gorilla emoji, and HALL has also posted photos of him holding large sums of money, indicative of drug trafficking proceeds. HALL identifies as a member of LNG and has explained that LNG is comprised of YBG Crips and BGF members. For example, on or about February 4, 2019, HALL Posted the following on his Instagram account:



110.    In this photo, HALL posed and appeared to make the LNG hand sign. HALL wrote that he was from LNG, which is comprised of Crips ("locs") and BGF members ("Guerillas").



111.    HALL has also posed in at least one music video of an LNG member posing with what appears to be a firearm. For example, HALL has appeared in a rap video of Antonio JOHNSON where HALL brandished a suspected handgun that bore a laser sight:



112.    On January 9, 2019, at approximately 9:38 a.m. HALL, utilizing TARGET TELEPHONE 5, called TARGET TELEPHONE 9. During the call POTTS said, "I'm about to send it to you." Further into the call, HALL asked POTTS, "You got any of them 2 O's?" POTTS did not hear, which prompted HALL to repeat the quest. HALL replied, "Man, you know I got it, yo. Pill, yo. Imma bout to block your number if you ask me again that." HALL laughed at POTTS and then asked POTTS, "Where you at?" POTTS did not hear HALL and said, "It's like you don't know me or something, yo." HALL repeated, "Where you at?" POTTS then responded, "I'm in the house." HALL then said, "I'm fixing to come through." POTTS replied, "Alright." Based on the context of the call, I believe that HALL asked POTTS for two ounces ("O's") of drugs. POTTS said he had that drugs and directed POTTS to come to his house, TARGET LOCATION 6. HALL acknowledged and said he would travel to POTTS to obtain the drugs.

113.    On January 13, 2019, at approximately 4:50 p.m., HALL, utilizing TARGET

TELEPHONE 5, received a call from 609-672-2834, a telephone being utilized by and unknown male (further referenced as UM 2834). UM 2834 asked, "Where are you at, bro?" HALL replied, "In the crib." UM 2834 then said, "I'm on my way right now. I need two." HALL responded, "A'ight." Based on the context of the call, I believe that UM 2834 was asking HALL for drugs. HALL then told UM 2834 he was at his house, referring to it by the common street term "crib." UM 2834 then said he wanted two units and was traveling to HALL's house, **TARGET LOCATION 9**. Therefore, I believe that HALL had drugs stored in **TARGET LOCATION 9**.

114.   On March 19, 2019, at approximately 2:27 p.m., POTTS, utilizing TARGET TELEPHONE 9, called Marcus HALL, who was utilizing TARGET TELEPHONE 5. During this conversation POTTS asked, "Are you ready yet?" HALL replied, "Uh, not yet." POTTS stated, "Alright, go ahead, go ahead, take your time." HALL replied, "I got, uh, probably four fifty though." POTTS stated, "Go ahead, go ahead, you alright." After a long pause POTTS asked, "You hear me?" HALL responded, "I got four fifty." The call then ended.\

115.   I believe that during the above described conversation between HALL and POTTS that POTTS was inquiring if HALL was ready to be re-supplied with drugs. HALL responded that he was not ready yet. POTTS told HALL to take his time. HALL then said he had "four fifty," which I believe meant $450. I know that drug suppliers often supply drugs on credit to distributors, who, in turn, repay the suppliers after they sell the drugs. Based on the context of the call, I believe HALL was saying that he had $450 in drug proceeds to provide POTTS and that POTTS told HALL to continue selling drugs.

116.   On March 23, 2019, at approximately 8:01 p.m., Ivan POTTS, utilizing TARGET TELEPHONE 9 called TARGE TTELEPHONE 5 and spoke to HALL. During this conversation POTTS asked, "What's up, you ready?" HALL replied, "Yeah." POTTS stated "Alright, cause

54

you at though?" LEWIS replied, "Right here. Up the way." WILLIAMS asked, "You up the way?" LEWIS replied, "Yeah." WILLIAMS replied, "Say, shit pull up my mother block. I got something for you." LEWIS replied, "Man, I'm right here now. I'm pulling down the street." WILLIAMS asked, "Say that again?" LEWIS replied, "Come on, I'm coming down the street now." During the conversation between WILLIAMS and LEWIS, WILLIAMS advised LEWIS that he was dealing with the death of his grandmother, and this is the reason he has not made contact with him.    WILLIAMS then directs LEWIS to meet him at his mother's residence, **TARGET LOCATION 7,** because he had money to provide him for the drugs that LEWIS had provided to him on credit ("I got something for you."). LEWIS advised WILLIAMS that he was coming to this location now.

120.    On April 4, 2019, at approximately 8:02 p.m., Michael WILLIAMS, utilizing TARGET TELEPHONE 12, received a call from TARGET TELEPHONE 13. During this call LEWIS asked, "Where you at champy?" WILLIAMS replied, "I'm up the Heights." LEWIS replied, "I'm right here in the Walgreen's parking lot, where at?" WILLIAMS replied, "I'm gonna walk over there." LEWIS replied, "Alright."

121.    I believe that during this call that WILLIAMS and LEWIS were coordinating a meeting. WILLIAMS told LEWIS he was "up the Heights," which I believe refers to Liberty Heights Avenue. LEWIS then said he was parking a Walgreens pharmacy parking lot, which I believe refers to the Walgreens at 3801 Liberty Heights Avenue, Baltimore, Maryland, which is in the area controlled by the YBG. I believe that WILLIAMS was again meeting LEWIS to provide him money owed to him for drugs provided previously on credit.

122.    On April 26, 2019, Judge Blake authorized the interception of wire communications occurring over TARGET TELEPHONE 13. The order authorized investigators to obtain GPS data

for the telephone. Throughout May 2019, GPS location data for LEWIS' phone showed the phone in the vicinity of Greenwich Place, an apartment complex at 10090 Mill Circle, Owings Mills, Maryland, on a nearly nightly basis. This is consistent with LEWIS residing at the location.

123.    In October of 2018, investigators had served an administrative subpoena Greenwich Place, to obtain the rental records for the entire apartment complex. This subpoena was executed during the course of a separate narcotics investigation conducted by the DEA. The rental records revealed that "Donte Lewis" was currently residing in 10090 Mill Circle, Apartment 340, Owings Mills, Maryland, **TARGET LOCATION 8.** The rental records revealed that LEWIS's lease will expire on September 20, 2019.

124.    On April 30, 2019, at approximately 8:41 p.m., Donte LEWIS, utilizing TARGET TELEPHONE 13, called 443-676-0215, a phone utilized by an unknown male ("UM 0215"). After exchanging pleasantries, LEWIS said, "My little cousin ready to come up there, Alotto, yo. For that one...and the other...uhh...the other...uhh....you said Crazy got one. You said three altogether, right? UM 0215 replied, "Umm, yeah. I sent the money for three of them so however it look. I got for one already. I'm getting ready to go on another one. And then you said your little cousin getting ready to come get one, so they the three that be gone. LEWIS said, "Alright that's a bet. We'll be good. I'm going to get something out tonight just to hold us over." UM 0215 said, "Why it's cool I was just...I need some bottles." WILLIAMS then said, "Uhh... what you be using Alotto? You got any extra ones that I can...umm... barrow? Whatever you give me I'll give it back. UM 0215 then said, "No, don't worry about it. I'm saying I should be alright until tomorrow morning, see my phone ain't really going to ring too often. After that I got like one or two more. LEWIS said, "Alright." UM 0215 said, "We're talking about one or two more...uhh... what's-

her-names more." LEWIS replied, "Alright." UM 0215 replied, "Alright." LEWIS said, "I'm going to hit you when you get up there though." UM 0215 said, "Alright," and the call ended.

125.    I believe that during this call that LEWIS and his younger cousin were preparing to travel to UM 0215's location to obtain drugs. LEWIS also told UM 0215 that James MURRAY (referring to him by the nickname "Crazy," which I believe is shorthand for the nickname "Crazy James"), received one unit of drugs. LEWIS then clarified that he meant a total of three units of drugs. UM 0215 said he had sent the money for three units of drugs. LEWIS and UM 0215 further discussed the drug supply quantities. UM 0215 ultimately told LEWIS not to worry because he had enough drugs to last until the next morning and that he did not anticipate many additional sales until then.

126.    On May 14, 2019, at approximately 9:04 a.m., Donte LEWIS, utilizing TARGET TELEPHONE 13, called 646-875-6273, a telephone number being utilized by an unknown male (further referred to as "UM 6273"). During this call UM 6273 stated, "What's good kid? What's going on?" LEWIS replied, "Ain't nothing. What's the word?" UM 6273 stated, "Shit, shit. Same shit." LEWIS stated, "Okay. What's up with um, your peoples? They ain't trying to let you come down this way?" UM 6273 replied, "No. I got to hit them up and see what's up." LEWIS stated, "Yeah see what's up. I had run into my man in town. That's why I ain't really been up there for real. Like, yo shit like a point, really two points higher. But shit, just like I ain't really had a chance to make it up there for real." UM 6273 stated, "Oh alright. You coming to see us?" LEWIS stated, "Yeah just let me know what's going on." UM 6273 stated, "Alright bet."

127.    I believe that during this call that LEWIS asked UM 6273 whether UM 6273's superiors would allow him to travel to Baltimore, Maryland. UM 6273 said he would have to speak to his superiors. LEWIS then said he had met with a supplier ("my man") in Baltimore, which is

why he had not recently traveled "up there." I believe this meant the New York area based on the area code of UM 6273's phone. LEWIS said, however, that his Baltimore supplier was charging $1,000 to $2,000 more per unit of drugs. I know that the term "point" is a common drug trafficking term for $1,000 and that it is usually used in reference to the price of bulk quantities of drugs.

128.     On May 14, 2019, at approximately 9:18 a.m., Donte LEWIS, utilizing TARGET TELEPHONE 13, called 443-418-4911, a telephone being utilized by an unknown male (further referred to as UM 4911). During the call, LEWIS told UM 4911, ""We going to be tight till Friday. He gonna, I got to go up now. Cause he talking about he got a couple but it; he got to hold'em over for his people. So he ain't even really trying to hit me with no more of them. So..." LEWIS further explained, "Friday, I'm going up for sure. Friday. I just got to scrape up all the money I can scrape up. So...between you, other two mans, for real, I'll have enough to go at least, well one, to hold niggas over till next Friday. And next Friday I'll be super straight. Cause I'll have a check from all the trucks. So basically, niggas be (inaudible). But this Friday I'm gonna have to try and shoot and grab something man. So try your best to make that, you know." that he was going to travel on Friday but he first needed to collect all of the money could. Based on the context of the call, I believe was telling UM 4911 that he was going to obtain drugs on the upcoming Friday which is why he needed all of the money could obtain. I believe LEWIS was explaining that he would obtain whatever amount of drugs he could purchase on the upcoming Friday, which would allow him to supply his customers until the Friday after that when he obtained more drugs. LEWIS and UM 4911 also continued to engage in a lengthy conversation about his local drug supplier and other matters.

129.     On May 15, 2019, at approximately 7:00 a.m., investigators monitored the court-authorized GPS data over LEWIS' cellular telephone, which showed the phone in the vicinity of

**TARGET LOCATION 10.** Investigators traveled to the apartment complex and entered the attached parking garage. On the third floor of the parking garage, investigators observed a parked Jeep Cherokee bearing a Virginia license plate. Investigators observed LEWIS get into the vehicle and drive away. LEWIS' phone also left the area contemporaneous with LEWIS' movements.

130.    On May 17, 2019, LEWIS was intercepted over TARGET TELEPHONE 13 speaking with UM 6273 (telephone number 646-875-6273). During the call, LEWIS indicated he would be traveling to UM 6273's location and would arrive at around 1:00 a.m. Investigators monitoring LEWIS' phone GPS data observed that LEWIS traveled from **TARGET LOCATION 10** to the New York City area. On May 18, 2019, LEWIS's phone GPS data showed LEWIS traveling back to Baltimore, Maryland. Investigators traveled south on Interstate 95 and then westbound on 695, and arrived at **TARGET LOCATION 10**. Once LEWIS arrived at **TARGET LOCATION 10**, investigators intercepted communications that indicated that LEWIS had been resupplied with drugs and was making arrangements to distribute them to his customer base. Therefore, I believe LEWIS stores controlled substances inside **TARGET LOCATION 10**.

### K) TARGET LOCATION 11: 2100 Clifton Avenue, Baltimore, Maryland 21217

131.    **TARGET LOCATION 11** is residence of James MURRAY, a/k/a "Crazy James," a member of LNG. Investigators identified a cellular telephone being utilized by MURRAY and applied for and received court authorization for interception of the communication over the cellular telephone. During the course of the interception over MURRAY's cellular telephone, investigators learned that MURRAY was consistently distributing drugs, along selling illegal firearms.

132.    On June 19, 2019, at approximately 8:49 p.m., through intercepted communications over James MURRAY's cellular telephone, investigators learned that members of the LNG were at the Liberty Deli and Grocery, located at 3834 Liberty Heights Avenue, Baltimore,

60

Maryland. Investigators believed that the LNG members were distributing drugs from this location. Investigators utilized video surveillance and observed several members of the organization, including MURRAY, HALL, and JOHNSON, at the location. Investigators believe that members were staying inside the store and then exiting the location to make suspected drug sales.

133.    On June 26, 2019 investigators intercepted communications over MURRAY's cellular telephone that indicated MURRAY would be selling an illegal firearm to an unknown individual. Through the intercepted communications over MURRAY's cellular telephone, investigators learned that MURRAY would be delivering the firearm to this individual in the area of the 2100 block of E. Monument Street. At approximately 1:17 p.m., investigators observed MURRAY in the passenger seat of a Chrysler sedan that arrived into the area. A man, believed to be the buyer of the firearm, was waiting on the street. At this time investigators activated their vehicle emergency equipment and stopped the vehicle. All occupants were removed from the vehicle and a High-Point 9mm semi-automatic pistol loaded with five rounds of 9mm ammunition was seized from the vehicle. A search of MURRAY also revealed one bag of suspected marijuana, one bag containing numerous gel capsules each filled with suspected heroin/fentanyl, and another bag containing numerous plastic "trash cans" each filled with suspected cocaine. All occupants were identified and then released from the scene. After the seizure of the firearm, MURRAY made several calls to different individuals discussing the police seizing the firearm.

134.    Through court ordered GPS data over MURRAY's cellular telephone during the month of June 2019, investigators learned that MURRAY was staying most nights in the area of the 2100 block of Clifton Avenue, Baltimore, Maryland. Through law enforcement databases, investigators learned that MURRAY was required to register with the Baltimore City Gun

Offender Program due to a recent illegal firearms possession conviction. Investigators learned that MURRAY provided the address of **TARGET LOCATION 11** as his residence.

135.    On June 26, 2019 investigators conducted video surveillance of 2100 Clifton Avenue, Baltimore, Maryland and at approximately 5:03 p.m., MURRAY was observed entering **TARGET LOCATION 11**.

## VII. REQUEST FOR EARLY ENTRY AND "NO KNOCK" WARRANT

136.    As described in the affidavit, members of LNG frequently possess firearms, including on their persons and in their homes. Many of the targets of these search warrants have prior arrests and convictions for firearms offenses. To date, investigators have seized over ten firearms in the course of the investigation. Furthermore, members of the organization have been intercepted discussing the possession and transfer of firearms. Through training and experience in this investigation and others, I know that narcotic traffickers are keenly aware of the potential dangers of rival competitors discovering the location of "stash" houses. To protect their illicit product and proceeds it is common for traffickers to possess firearms on their person as well as in their residences. Accordingly, I believe that the targets of the search warrants may be in the possession of firearms at the **TARGET LOCATIONS**. Finally, law enforcement officers intend to execute multiple search warrants and arrest warrants simultaneously, to include the **TARGET LOCATIONS**, which will heighten the need for early entry and heighten concerns for officer safety. Based on my training and experience, I know that drug traffickers often attempt to flee, remove contraband, and destroy contraband during the execution of search warrants.

137.    Based on the foregoing, I am requesting permission to enter the **TARGET LOCATIONS** prior to 6:00 a.m. I am also requesting authorization to enter the following locations without giving notice or authority (i.e. "no knock warrants"):

19-2333 ADC *thru* 19-2343 ADC

  a. 3106 Oakford Avenue, Baltimore, Maryland

  b. 4048 Hilton Road, Second Floor Apartment, Baltimore, Maryland

  c. 3922 Fairview Avenue, Baltimore, Maryland

  d. 4002 Fairfax Road, Baltimore, Maryland

  e. 10005 Mill Centre Drive, Apartment 487, Owings Mills, Maryland

  f. 3955 Bonner Road, Baltimore, Maryland

  g. 2100 Clifton Avenue, Baltimore, Maryland

## VIII. CONCLUSION

138. Based upon the foregoing, I respectfully submit that there is probable cause to believe that in the **TARGET LOCATIONS** discussed herein, are the items set forth in Attachment B, which constitute evidence, fruits, and instrumentalities of the aforementioned violations of federal laws. WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for each of the **TARGET LOCATIONS** and authorize the search and seizure of the items described in Attachment B.

Brian T. Shutt
Task Force Officer
Drug Enforcement Administration

Sworn to before me this _____ day of July 2019.

THE HON. A. DAVID COPPERTHITE
UNITED STATES MAGISTRATE JUDGE

63

## ATTACHMENT A-1

### 3106 Oakford Avenue, Baltimore, Maryland 21215

3106 Oakford Avenue, Baltimore, Maryland 21215 is a brick row home. The residence has a covered front porch area, and a grey colored front door with glass inserts near the top of the door. The residence has a black colored mailbox to the left of the front door. The residence has three windows facing the front on the second floor, and two windows facing the front on the ground level:





## ATTACHMENT A-2

### 3907 Bonner Road, Baltimore, Maryland 21216

**3907 Bonner Road, Baltimore, Maryland 21216 is a brick row home.** The residence has a covered front porch with a dark colored front door. The numbers "3907" are attached to the left side of the front door. The residence has five windows on the front side. The front of the residence has a metal fence:



65

## ATTACHMENT A-3

**4048 Hilton Road, Second Floor Apartment, Baltimore, Maryland 21215**

**4048 Hilton Road, Second Floor Apartment, Baltimore, Maryland 21215** is the second floor apartment located inside of a brick row home.  The residence has a black metal gate screen door, along with a dark colored front door.  There are two black mailboxes to the left of the front door.  The number "0", and an upside down "4" are attached to the right side of the door.  The second floor of the building has three windows that face the front:





## ATTACHMENT A-4

### 3316 Arydale Avenue, Baltimore, Maryland 21216

**3316 Arydale Avenue, Baltimore, Maryland 21216** is a business located on the 3300 block of Arydale Avenue. The target location is a light colored brick building. The business has a glass front door with the name "Opaque" and the numbers "3316" attached to the front. The front of the business has a large window, and inside the window is a neon "open" sign:





## ATTACHMENT A-5

### 8624 Glen Hannah Court, Windsor Mill, Maryland 21224

**8624 Glen Hannah Court, Windsor Mill, Maryland 21224** is a brick, two story single family residence. The residence has black colored grated steel front doors. There are two lion statues, one on each side at the front of the residence. The residence has a driveway that leads to the side of the residence which has two garage doors (one garage door is a two car garage door, and the second is a single car garage door). The residence has a green colored mailbox located where the driveway of the residence meets the street. The mailbox has the number "8624" attached:







## ATTACHMENT A-6

### 3922 Fairview Avenue, Baltimore, Maryland 21216

**3922 Fairview Avenue, Baltimore, Maryland 21216** is a single family residence. The residence has white colored siding, and appears to be three stories. The front door to the residence is white with an oval glass center. There are concrete steps leading to the front door of the residence, with wooden rails. There is a black mailbox to the right of the front door. The residence has a black in color metal fence around the property:





<u>Attachment A-7</u>

<u>4002 Fairfax Road, Baltimore, Maryland 21216</u>

**4002 Fairfax Road, Baltimore, Maryland 21216** is a brick row home. The residence has a covered front porch. The entrance to the residence has a metal storm door and white colored front door with glass inserts. The numbers "4002" are attached to the front of the covered porch. The residence as two sets of concrete steps leading to the front porch:



70



## ATTACHMENT A-8

**10005 Mill Centre Drive, Apartment 487, Owings Mills, Maryland 21117**

**10005 Mill Centre Drive, Apartment 487, Owings Mills, Maryland 21117** is is an apartment located in an apartment complex located at 10005 Mill Centre Drive. The rear entrance to the building has a white colored door with the numbers "10005" attached. The front door to the residence is green colored with the numbers "487" attached to the left of the front door:



71



## ATTACHMENT A-9

### 3955 Bonner Road, Baltimore, Maryland 21216

**3955 Bonner Road, Baltimore, Maryland 21216** is a single family residence. The residence has light colored siding and a covered front porch. The residence has a white colored front storm door and a light colored front door. The numbers "3955" are attached to the right of the front door. The residence has a metal fence around the property:



72

## ATTACHMENT A-10

### 10090 Mill Run Circle, Apartment 340, Owings Mills, Maryland 21117

**10090 Mill Run Circle, Apartment 340, Owings Mills, Maryland 21117** is an apartment located in the Greenwich Place apartment complex. Apartment 340 is located on the east side of the complex. The front door to the apartment is red colored and has the numbers "340" attached. The front door also has a silver colored metal knocker attached to the front door:



73

## ATTACHMENT A-11

### 2100 Clifton Avenue, Baltimore, Maryland 21217

2100 Clifton Avenue, Baltimore, Maryland 21217 is a row home. The first story is brick and the second story (front) has light colored siding. The residence has a covered front porch. The front door to the residence has a metal storm door, and a light colored front door. The numbers "2100" appear to the right of the front door, along with a black in color metal mailbox:





## ATTACHMENT B

### PROPERTY TO BE SEIZED

**The TARGET LOCATIONS will be searched for the following:**

(A) Heroin, fentanyl, cocaine, cocaine base ("crack"), marijuana, and any other controlled substances, as well as any materials or items used for the preparation, manufacture, and distribution of controlled substances, including, but not limited to glass and/or plastic containers, baggies, scales, gel capsules, vials, cutting agents, razors, scales, and vacuum sealers;

(B) Firearms, ammunition, and firearms-related property, including, but not limited to holsters, magazines, ammunition boxes, and gun cleaning kits;

(C) Books, records, receipts, notes, ledgers, money orders, and other papers relation to the transportation, ordering, sale, and distribution of controlled substances and drug paraphernalia, and the profits derived from those transactions;

(D) Papers, airline tickets, passports, notes, schedules, receipts, and other items relating to domestic or foreign travel;

(E) United States currency, foreign currency, precious metals, jewelry, financial instruments including but not limited to, stocks and bonds;

(F) Books or papers which reflect names, addresses, and/or telephone numbers of co-conspirators involved in drug trafficking;

(G) Indicia of occupancy, residence, ownership or lease of the residence/unit/vehicle identified on the warrant, including but not limited to utility and telephone bills, other mail, and keys;

(H) Photographs of co-conspirators, of assets, and/or of controlled substances, in particular, marijuana, heroin, fentanyl, cocaine and cocaine base;

(I) Cellular telephones and computers;

(J) Documents and photos evidencing gang membership and affiliation with the Yellow Bus Gang, Crips, Black Guerrilla Family, and Liberty and Garrison enterprise, including, but not limited to: membership lists, rules, oaths, constitutions, letters from fellow gang members, and photos of members.

(K) Evidence of the conspiracy to distribute and distribution of drug paraphernalia, including shipping manifests, order receipts, transaction records; and

(L) Evidence relating to the ownership, management, and operation of the "Opaque" and "North-West" variety stores, including, but not limited to real estate records, corporate charters, inventory records, and financial records.

